Approved: _____

DAVID ABRAMOWICZ and ROBERT ALLEN
Assistant United States Attorneys

Before:   HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

**16 MAG 2768**

DOC #_____

- - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :    **COMPLAINT**
                                 :
         - v. -                  :    Violations of
                                 :    21 U.S.C. §§ 812,
                                 :    841(a)(1), 841(b)(1)(C),
JASON MARLEY,                    :    and 846; 18 U.S.C.
     a/k/a "Maurney,"            :    §§ 924(c)(1)(A)(i) and 2
     a/k/a "Barber,"             :
ELAINE HERON,                    :    COUNTY OF OFFENSE:
     a/k/a "Mama,"               :    BRONX
DENILLE JAMESON,                 :
     a/k/a "Danielle,"           :
ORLANZO HARLEY,                  :
     a/k/a "Oliver,"             :
     a/k/a "Gunner,"             :
RADIANNA THOMPSON,               :
     a/k/a "Raidy,"              :
NYKOLI WILLIAMS,                 :
     a/k/a "Shauney,"            :
                                 :
         Defendants.             :
                                 :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JAMES J. ENDERS, being duly sworn, deposes and says that he
is a Special Agent with the Drug Enforcement Administration
("DEA") and charges as follows:

## COUNT ONE
### (Narcotics Conspiracy)

     1.   From in or about February 2015 up to and including in
or about April 2016, in the Southern District of New York and
elsewhere, JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," ELAINE
HERON, a/k/a "Mama," DENILLE JAMESON, a/k/a "Danielle," ORLANZO
HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a

"Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2.    It was a part and an object of the conspiracy that JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," ELAINE HERON, a/k/a "Mama," DENILLE JAMESON, a/k/a "Danielle," ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a "Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3.    The controlled substance that JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," ELAINE HERON, a/k/a "Mama," DENILLE JAMESON, a/k/a "Danielle," ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a "Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants, conspired to distribute and possess with intent to distribute was 50 kilograms and more of marihuana, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

**COUNT TWO**
**(Firearm Possession in Connection with a Narcotics Offense)**

4.    From in or about February 2015 up to and including in or about April 2016, JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a "Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics offense charged in Count One of this Complaint, knowingly did use and carry a firearm, and in furtherance of such narcotics offense, did possess a firearm, to wit, handguns.

(Title 18, United States Code, Section 924(c)(1)(A)(i) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.    I have been a Special Agent with the DEA for approximately 11 years.  During that time, I have participated in investigations of, among other offenses, unlawful drug

trafficking, weapons possession, and money laundering, and, among other things, have conducted or participated in surveillance, the execution of search warrants, reviews of taped conversations and drug records, and investigations that included the interception of wire and electronic communications and the execution of premises search warrants based on information obtained through those interceptions.  Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the "lingo" and coded language used by narcotics traffickers.

6.    The information contained in this Complaint is based upon my personal knowledge and participation in this investigation, as well as on my conversations with other law enforcement agents and my examination of reports and records, including audio recordings and line sheets from judicially authorized wire intercepts, and records documenting items found during the execution of search warrants.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Background

7.    This investigation concerns, among other things, the distribution of narcotics and the use and possession of firearms in connection with and in furtherance of that drug-trafficking activity.  For the reasons described in greater detail below, I believe that JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, coordinates the transportation and distribution of narcotics, including marihuana, and has conspired to distribute narcotics through and with the assistance of multiple other individuals, including ELAINE HERON, a/k/a "Mama," DENILLE JAMESON, a/k/a "Danielle," ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a "Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants.

8.    As part of this investigation, wiretaps of telephones used by JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, were approved by the Honorable Shira A. Scheindlin,

United States District Judge, Southern District of New York, on
or about December 30, 2015, by the Honorable Lewis A. Kaplan,
United States District Judge, Southern District of New York, on
or about February 4, 2016, and by the Honorable Gregory H.
Woods, United States District Judge, Southern District of New
York, on or about March 25, 2016 (collectively, the "Intercept
Orders").  Each of the Intercept Orders authorized a 30-day
period of interception.

## The February 2015 Traffic Stop and Seizure of Approximately $20,000

9.    Based on my participation in this investigation and
conversations with other law enforcement agents, I have learned,
in part, the following:

a.    On or about February 4, 2015, a law enforcement
agent acting in an undercover capacity ("UC-1") placed a
Spanish-language call to a cellular telephone ("Subject Device-
1").  A Spanish-speaking male with a Caribbean accent, later
identified as JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the
defendant, answered.  UC-1 then stated that UC-1 had "100" for
MARLEY; MARLEY replied that MARLEY was presently in Cleveland,
Ohio, but would return to New York, New York, on the then-
upcoming Friday, February 5, 2016, and would meet UC-1 at 11:00
a.m. in New York, New York.

b.    On or about February 4, 2015, law enforcement
obtained a New York State Court-issued order (the "February 2015
Order") that provided real-time geolocation information for
Subject Device-1.  On or about February 5, 2015, data returned
in response to the February 2015 Order revealed that Subject
Device-1 was then located in Cleveland, Ohio, as professed by
MARLEY during his call with UC-1 on the prior day.  On or about
February 6, 2015, I requested that a DEA Special Agent stationed
in Cleveland, Ohio (the "Cleveland Agent") conduct surveillance
in the vicinity of the geolocation data associated with Subject
Device-1.  The Cleveland Agent informed me, in substance and in
part, that he observed a Nissan Maxima with New York license
plates ("Vehicle-1") in a parking lot adjacent to a building in
which Subject Device-1 was then located.

c.    On or about February 8, 2015, I and other law
enforcement agents in New York, New York stopped Vehicle-1 in
New York, New York.  MARLEY and another individual were present
in Vehicle-1 during the stop.  Each consented to a request to
search Vehicle-1.  In conducting this search, I observed a

4

strong odor of marijuana within Vehicle-1, as well as
approximately $20,000 in United States Currency (primarily in
small denominations and bundled in a manner which I recognized
to be consistent with the packaging of narcotics proceeds)
located in the trunk of Vehicle-1. MARLEY stated that the
currency was obtained from racetrack winnings, despite the
presence of denominations of $1 bills, $5 bills, and $10 bills,
and despite the geolocation data obtained from the February 2015
Order demonstrating that MARLEY had not stopped at a racetrack
on February 8, 2015.[1]

### The February 2016 Traffic Stop and Seizure of Marihuana

10.   I have reviewed multiple communications intercepted
pursuant to the Intercept Orders in which JASON MARLEY, a/k/a
"Maurney," a/k/a "Barber," and others discussed the
transportation of marihuana shipments from Philadelphia,
Pennsylvania, to New York in or about February 2016. I also
participated in the seizure in the Bronx, New York, of part of
that shipment from a co-conspirator ("CC-1") often referred to
by MARLEY and other members of the conspiracy as "Hindu" or the
"Indian." I have learned, among other things, the following:

a.   On or about February 2, 2016, CC-1 asked MARLEY,
"[W]hat are you dealing with?" MARLEY stated, "I want to start
to check over here and just shoot the things to you and you do
what you have to do." CC-1 responded, "I am ready when you are
ready, you know, because I do not have anything doing."[2]

b.   On or about February 7, 2016, MARLEY stated to a
supplier of marihuana, "Tuesday man, Tuesday, Indian is just
going to grab it down the road, and make one run come up the
road, you see it?" In a subsequent conversation with the same
supplier on or about February 9, 2016, MARLEY stated, "Indian is
going to pick up the little thing from 'Delphia."

c.   On or about February 8, 2016, MARLEY complained
to a co-conspirator ("CC-2") that "Indian is going on the phone

---

[1] The New York County District Attorney's Office ultimately
declined to prosecute the case. MARLEY was, however, processed
during the course of the arrest, resulting in his
identification.

[2] All transcriptions cited in this Affidavit are preliminary and
in some instances based on Patois translations.

and calling" another individual ("CC-3") "and asking him about owing money dog."

d.   On or about February 14, 2016, MARLEY told CC-1, "Remember we are going to have to try to get a van tomorrow, you know.  Because if anything, Tuesday, you know, the thing is program."  The then-upcoming Tuesday was February 16, 2016.  MARLEY also expressed to CC-1 his desire that a larger vehicle— e.g., "like a Town and Country" minivan—be used for the trip, and instructed CC-1 to have "Shauney . . . just rent it."

e.   On or about February 15, 2016, CC-1 informed MARLEY that CC-1 was using "my mother old car," which he described as "[t]he Murano."  Based on my participation in this investigation, I believe the "Murano" was a reference to a vehicle, a Nissan Murano.

f.   On or about February 15, 2016, MARLEY and NYKOLI WILLIAMS, a/k/a "Shauney," discussed the narcotics being transported by, among others, CC-1.  MARLEY told WILLIAMS, "I need a little van.  A Caravan too dog.  I need a Caravan."  MARLEY also stated, "[Y]ou know you cannot pull up with Indian.  Pull up with the food them and carry those big boxes upstairs.  It is going to be a joke."

g.   On or about February 16, 2016, CC-1 asked MARLEY to confirm "[G]unner's number," i.e., the phone number for ORLANDO HARLEY, a/k/a "Gunner," a/k/a "Oliver."  CC-1 also stated to MARLEY, "[I]f Gunner can go to the check cashing and fax the thing to me, I could collect it.  You understand?"  MARLEY responded, "Alright then.  I am going to try to do that now."  CC-1 responded, "Call him and tell him to call me."

h.   On or about February 16, 2016, CC-1 stated to MARLEY, "I can't do things for a dollar fifty," which he said "is what you give me."  MARLEY stated, "[W]hen we have some more butter, I will send you or [Unintelligible] to come to this side, because I want the rotation to build up the thing.  When he comes in I am going to call you."  Subsequently, CC-1 stated to MARLEY, "The Murano could fit two of the joints, right?"  MARLEY responded, "Yeah, yeah, yeah.  Do that then."  CC-1 stated, "And then he will just shub one in the Max."  Based on my participation in this investigation, I believe the "Murano" and the "Max" referred to vehicles, a Nissan Murano and a Nissan Maxima, and that MARLEY and CC-1 agreed that CC-1 would transport one box of narcotics in the Nissan Murano, and another co-conspirator would transport two boxes of narcotics in the

Nissan Maxima.

i.   Subsequently on or about February 16, 2016, MARLEY told CC-1, "They want to do a delivery, so just wait a little. CC-1 responded, "Oh okay, okay. Alright." Later that day, MARLEY asked, "He come now brother?" CC-1 responded, "Yeah, we got three of them." MARLEY instructed CC-1 to "just go to Elaine then, you hear?" CC-1 responded, "I am just going to drop off the kids and then carry it to Elaine." MARLEY stated, "I am just going to let you give Shauney the suitcase she said she can get some big face with it."

j.   On the evening of February 16, 2016, law enforcement officers and I attempted to stop CC-1's vehicle, a Nissan Murano, in the Bronx, New York. CC-1 sped away, leading police on a high-speed chase. During the chase, CC-1 threw what appeared to be a box from his vehicle. Law enforcement officers recovered the box, which contained approximately 35 pounds of marihuana.[3]

k.   On or about February 17, 2016, following CC-1's arrest, MARLEY called WILLIAMS and stated, "I tell the boy to get a rental, a[] van man, the said he is going to drive his baby mother M[u]ran[o] what cannot hold two of the big things them Mumsie." MARLEY also called another co-conspirator ("CC-4") and stated, "Hindu had 35. He had one of the things them, and the next dog had two. He got scraped over Bronx." Based on my training and experience, as well as my participation in this investigation, I believe MARLEY was telling CC-4 that CC-1 ("Hindu") had been arrested ("scraped") with a box that contained approximately 35 pounds ("35") of marihuana, but that another co-conspirator had two additional boxes ("the next dog had two").

### ELAINE HERON, a/k/a "Mama," and Premises-1

11.   Pursuant to the Intercept Orders, law enforcement agents have intercepted communications of JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," with and regarding ELAINE HERON, a/k/a "Mama," the defendant, who resides at a premises in Brooklyn, New York ("Premises-1"). In addition to the communications concerning HERON described above, those

---

[3] CC-1 subsequently entered a plea of guilty to a charge in New York State court.

interceptions have included, among other communications, the following:

      a.   On or about the night of March 31, 2016, MARLEY directed ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," the defendant, to retrieve "two single ones" from "Elaine's" apartment, so that they can be given to a co-conspirator ("CC-5").

      i.   At approximately 7:57 p.m., MARLEY called HARLEY.  The conversation that followed included, among other communications, the following exchange:

| HARLEY: | Cuz |
|---|---|
| MARLEY: | Gunner. |
| HARLEY: | Yeah. |
| MARLEY: | I want, I want two things there. |
| HARLEY: | Yeah.  So, go upstairs to them? |
| MARLEY: | So, then it's it you, the thing man.  It's you who know where it is you know Cuz.  Then it must be up there. |
| HARLEY: | Yeah, yeah, yeah, yeah, yeah. |
| MARLEY: | All right. |
| HARLEY: | Go for them now? |
| MARLEY: | Yeah.  Mm hmm. . . . |

      ii.   At approximately 8:06 p.m., HERON called MARLEY.  The conversation that followed included, among other communications, the following exchange:

| MARLEY: | Yeah.  Mama E. |
|---|---|
| HERON: | Hey, you know that is sign I signed off.  I, I signed off of work from evening, you know. |
| MARLEY: | No man, I said Gunner is coming for a two thing, give it to him for me.  Please. |
| HERON: | He came up already, but I am telling you that I signed off, I signed off. |
| MARLEY: | Oh, yeah man, everything good now.  Yeah.  All right. |

      b.   On or about the morning of April 7, 2016, law enforcement agents intercepted calls in which HERON and MARLEY apparently discussed, among other things, co-conspirators who

retrieved quantities of narcotics or other contraband from
HERON's apartment, as well as HERON's fears that MARLEY will be
arrested by the police.  The intercepted conversations included,
among other communications, the following:

        i.    At approximately 9:48 a.m., HERON called
MARLEY.  The conversation that followed included, among other
communications, the following exchange:

| | |
|---|---|
| HERON: | [L]et me tell you something now.  You see Bim, he came here last… yesterday saying um… um… I'm to give him things to to… [Voices overlap] |
| MARLEY: | No, man no, man, listen, won't you.  No, mommy… mommy won't you listen.  It's missed, he misunderstood, he was to go to Raidy and normally I would have send the thing but you did the right thing because listen, the car they had wasn't appropriate, it was too little Mama.  So when he explained, to what I told him.  [Voices overlap] |
| HERON: | Because I told him… I was saying, 'how am I to…" I said "no I can't" [Unintelligible] [Voices overlap] |
| MARLEY: | Yeah, you're right man, you did the right thing, man, it's you man.  Listen, he didn't… no… they were never going to get that food there.  Because…because the car Mama is a little small car that you can see into the back.  You understand? |
| | . . . . |
| MARLEY: | So I have some little things to… the next half, I'm going to make him get it today because the men are… the same thing I was telling you, [the] man is calling me down for some a little idiot paper and I'm going to make what's his name there, Bim, carry something to come [and] give you to put on the dog's account, you hear. |
| HERON: | Yeah but listen to what I'm saying Maurney. |
| MARLEY: | Yeah. |
| HERON: | Listen because I want you… because you know I'm a principle woman and certain things don't [Unintelligible].  [Voices overlap] |

| | |
|---|---|
| MARLEY: | No, man.  Won't you listen Mama, man, won't you listen.  Once you did what you had to do, you don't have to explain anything.  [Voices overlap] |
| HERON: | [Unintelligible] |
| MARLEY: | The dog called me already and I told him already that you did the right thing [Unintelligible].  [Voices overlap] |
| | . . . . |
| HERON: | Oliver said that you're going to be upset.  I said "upset for what?"  [Unintelligible] [Voices overlap] |
| MARLEY: | No, man I'm not upset, I'm not upset. . . . |
| HERON: | Yeah, listen let me tell you what I dreamed, I dreamed… I don't know if it's how I went to my bed, so ignorant.  I dreamed that [the] police came to you today and took you out, so be careful of anything like that and God goes with you.  I've already prayed it off already, alright. |
| MARLEY: | Yeah? |
| HERON: | Yeah! |

ii.    At approximately 9:55 a.m., HERON again called MARLEY.  The conversation that followed included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Yo, Mama. |
| HERON: | Maurney, you know that Oliver took something, you heard him tell you? |
| MARLEY: | Take? |
| HERON: | Huh? |
| MARLEY: | What [did] he take? |
| HERON: | One! |
| MARLEY: | Okay, alright, yeah man, yeah man, let him… since he took one, alright. |
| HERON: | Alright. |
| MARLEY: | He, he weighed it out though, you saw him weigh it out? |

| HERON: | Yeah I stood up, I stood up at the kitchen door because I told him [that] any time you're not here… [Voices overlap] |
| MARLEY: | Alright, alright, alright. [Voices overlap] |
| HERON: | I stood up and watched what he was doing. I saw him put it on the scale and weighed it, man. |
| MARLEY: | Alright. |

12.   Based on my involvement with this investigation and my training and experience, I believe that HERON assists MARLEY by stashing narcotics and tools of drug-trafficking at PREMISES-1, by screening visitors who arrive to pick up narcotics or other contraband, and by confirming with MARLEY whether such individuals were authorized to retrieve particular items.

13.   I have reviewed records from a company that provides utilities to Premises-1, and I have learned, among other things, that the customers associated with Premises-1 account are ELAINE HERON, a/k/a "Mama," the defendant, and an individual who is currently incarcerated.

14.   On or about April 28, 2016, law enforcement officers searched Premises-1 pursuant to a Search Warrant authorized by Chief United States Magistrate Judge Roann L. Mann of the Eastern District of New York.  ELAINE HERON, a/k/a "Mama," the defendant, was the only individual present at Premises-1 during the search, and she stated, in sum and substance, that she resides there.  Items recovered during the search included, among other things, approximately 105 pounds of marihuana (including packaging), a digital scale, and a ballistics vest.

**DENILLE JAMESON, a/k/a "Danielle," and Premises-2**

15.   Pursuant to the Intercept Orders, law enforcement agents have intercepted communications of JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, with and regarding DENILLE JAMESON, a/k/a "Danielle," the defendant, who resides at a premises in Brooklyn, New York ("Premises-2").  In addition to the communications concerning JAMESON described above, those interceptions have included, among other communications, the following:

          a.   On or about March 28, 2016, law enforcement intercepted calls in which MARLEY and CC-3 apparently discussed, among other things, MARLEY's efforts to find, and then weigh on

a scale by units of grams, something JONES had stashed in "a little green bag" at a home where "Danielle" resides.

      b.   On or about April 1, 2016, law enforcement agents intercepted multiple calls in which MARLEY, CC-3, ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," and JAMESON apparently discussed an incident in which CC-3 "clapped"—i.e., shot—someone in Brooklyn.  The intercepted calls included, among other communications, the following:

      i.   CC-3 called MARLEY and stated, "I gotta come see you man!"  MARLEY asked whether "[s]omething happened," to which CC-3 responded, "Yeah man!"  MARLEY then called HARLEY and told him to "look downstairs" for "Danielle's brother," who would be driving up soon in "[a] Maxima."  CC-3 then called MARLEY, and they discussed the whereabouts of "Oliver."  During that call, MARLEY called HARLEY, enabling MARLEY to communicate with both CC-3 and with HARLEY, and the conversation that followed included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Cuz. |
| HARLEY: | Yeah. |
| MARLEY: | He is right in front of the building, Gunner.  Take that from him there.  Let me see what he's saying. |
| HARLEY: | All right. |
| MARLEY: | All right.  Cuz, did you hear me? |
| HARLEY: | What did you say family? |
| JONES: | Yeah. |
| MARLEY: | He's in the Maxima. |
| JONES: | Yo. |
| MARLEY: | Is the Maxima you're driving, right? [Voices Overlap] |
| JONES: | Yeah. |
| MARLEY: | It's the Maxima.  All right.  All right. |
| HARLEY: | All right.  I am coming. |

      ii.   CC-3 again called MARLEY shortly thereafter. MARLEY stated to CC-3, "Brother, why you be making some stupid moves?  You have a team.  You carry the dogs to do what they are to do.  Come on, man."

        iii.      MARLEY subsequently called and spoke with CC-3 again.  During that discussion, CC-3 asked MARLEY to "[g]o by Tilden and Veronica" and "find out what happened for me please."

        iv.      Subsequently, MARLEY spoke with JAMESON. The conversation that followed included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Yo D, where are you?? |
| JAMESON: | I'm just on the um, down the road. |
| MARLEY: | Yo a lot of things are happening.  Can you, yo…?  Don't you know that your brother, man… I try to talk to this dude man.  Do you know that… |
| JAMESON: | What happened? |
| MARLEY: | Please do not say nothing, you know.  I was asking if he called you and told you, he said no.  This man called me on 21st "Yo, [Marley], hurry up!  Come!  You gotta come now . . . ."  When I went over there, I saw him and sent him to Oliver.  Do you know that this boy clapped somebody?  Some one of his friends that are on Tilden.  Danielle? |
| JAMESON: | [CC-3]? |
| MARLEY: | Danielle, I could not believe it.  Hold on there, Danielle.  [Aside: Hello.  Yo!  Try to park on Tilden and Veronica and tell me what you see happened over there, brother.  You hear me? . . .] |
| | . . . . |
| JAMESON: | Are you talking to me? |
| MARLEY: | Yeah.  No.  I was just telling my friend to drive pass over there.  This youth does not listen.  I said, my youth, already I called him and told him.  It looks like it is the same dude, the night, that he was in the little scuffling with.  And I told him that, dog….  He said he was up there talking to one of Snoop's homeboy.  You know who Snoop is Danielle? |
| JAMESON: | Yeah, yeah. |

MARLEY:     So him and Snoop's homeboy got into it.  So
            I said my youth... you and Snoop's homeboy got
            into it, right?

JAMESON:    Mhm.

MARLEY:     If you and him get into it, what are you
            supposed to do?  Huh?  Don't you just take
            it easy?  Isn't it better you call me and
            let me send two of the Dogs.  This man went
            around to the house, he does not know what
            he did and clapped the dog, he claimed.  Now
            we have fucking problems, man.  You know
            what I am saying?

                   . . . .

MARLEY:     If he had a problem with them, I told him
            before that it's my dogs run over there.  We
            can sort it out.  And I was saying,
            sometimes [CC-3], you do not need to be over
            there.  If you and a man are going to be in
            scuffling and you and them are always
            getting into it, you do not need to be
            around them.  It is better you stay over the
            East or fuck with me then dog, over on the
            first, then leave niggas alone, if you are
            going to get into certain things with them.
            You understand what I am saying, D?

JAMESON:    So you went around there and what did you
            do?

MARLEY:     Huh?

JAMESON:    You went around there?

MARLEY:     I just went around there to take out what he
            told me to take out.  I have the car on
            21st.  He said to take the car keys from
            whatever.

        v.      From discussions with law enforcement
officers, I have learned that during the afternoon on or about
April 1, 2016, there was a shooting in the vicinity of Tilden
Avenue and Veronica Place in Brooklyn, New York.  A man was shot
in the abdomen and was hospitalized.  CC-3 was arrested in the
vicinity of Philadelphia, Pennsylvania, on New York State
charges on or about April 6, 2016, in relation to that shooting.

        c.   On or about April 6, 2016, law enforcement agents
intercepted a call in which MARLEY and JAMESON apparently

14

discussed, among other things, MARLEY's efforts to find "like a buck fifty or 200" of "[t]he thing that me and him deals with" in a laundry bag MARLEY had previously retrieved from Premises-2.  The conversation that followed included, among other communications, the following exchange:

MARLEY:     Danielle.

JAMESON:    Yeah.

MARLEY:     You found the thing that he had?  The thing that me and him deals with?

JAMESON:    No I did not find no more.

MARLEY:     No I am not talking about the money but I am saying he had something there.  He told me where it was at.  But I do not see.

JAMESON:    I thought you thinged it out?

MARLEY:     Yeah but I am feeling the bag and I do not feel nothing in the bag.  Unless if he…. Did you look in the next laundry bag?

JAMESON:    I did.  I did not see nothing.

MARLEY:     You searched both of them?

JAMESON:    I think so.

MARLEY:     No, that means it is one of those laundry bags then.  You got to search because I am trying to find it.  You are supposed to have like a buck fifty or 200.  I do not know. You are going to have to search the house then.  'Cause the bag that he had it in, I am just searching the bag and I cannot find it.  It is not in there.  Unless it is in the jacket or it is in the next laundry bag.

JAMESON:    I don't know.  I don't know.

MARLEY:     Hmm?

JAMESON:    I don't know and I am at work.

MARLEY:     Hold on.  Hold on.  Let me see something. Let me look in the knapsack that he has.  I am going to call you back.

JAMESON:    Yeah.

     d.   On or about April 9, 2016, law enforcement agents intercepted a call in which MARLEY and JAMESON apparently continued to discuss items.  Based on my review of

communications obtained pursuant to the Intercept Orders, as well as my review of location data, I believe their discussion concerned whether those items were present at Premises-2. The conversation included, among other communications, the following exchange:

| | |
|---|---|
| JAMESON: | Anyway [CC-3] called and he said ahm if you took out any papers from the closet because he cannot find the papers he is looking for. |
| MARLEY: | How much papers?  Remember that some little papers were in the bag, you know. |
| JAMESON: | Yes. |
| MARLEY: | About 600. |
| JAMESON: | Alright so you have that? |
| MARLEY: | Yeah it is in the bag said way.  I have not touched it. |
| JAMESON: | What bag? |
| MARLEY: | You don't know his little knapsack bag with some little, with some little bottle bottle and some little things. |
| JAMESON: | Mhm no.  I guess that's what he was looking for but the way how he was talking like it was more.  He said look in the vest and I could not find it. |
| MARLEY: | Where he said the lady is at, the girl? |
| JAMESON: | Talk to you about that when I come in.  I found something else and I put it in your suitcase. |
| MARLEY: | Okay. |
| JAMESON: | The other thing. |
| | . . . . |
| JAMESON: | The Blanco. |
| MARLEY: | Uh! |
| JAMESON: | The Blanco but it is a little bit. |

16.  Based on my involvement with this investigation and my training and experience, I believe that DENILLE JAMESON, a/k/a "Danielle," the defendant, assists JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, by stashing narcotics and tools of drug-trafficking at Premises-2, such as the

"suitcase" into which JAMESON said she had placed "[t]he Blanco."

17.   I have reviewed records from a company that provides utilities to Premises-2, and I have learned, among other things, that the customer associated with the Premises-2 account is DENILLE JAMESON, a/k/a "Danielle," the defendant.

18.   On or about April 28, 2016, law enforcement officers searched Premises-2 pursuant to a Search Warrant authorized by Chief United States Magistrate Judge Roann L. Mann of the Eastern District of New York.  Items recovered during the search included, among other things, glassine envelopes that I recognize, based on my experience, to be commonly used to package narcotics such as heroin, as well as approximately several thousand dollars in United States currency.  DENILLE JAMESON, a/k/a "Danielle," the defendant, was present at the time the search occurred, and was arrested.

### ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," and Premises-3

19.   Pursuant to the Intercept Orders, law enforcement agents have intercepted communications of JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, with and regarding ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," the defendant, who resides at, among other locations, a premises in Jamaica, New York ("Premises-3").  In addition to the communications concerning HARLEY described above, those interceptions have included, among other communications, the following:

a.   On or about February 25, 2016, law enforcement agents intercepted a call in which MARLEY and, among others, ELAINE HERON, a/k/a "Mama," the defendant, apparently discussed a "custy war"—i.e., a customer war—and the "serious[ness]" with which HARLEY fights over drug customers.  The conversation that followed included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | What are you saying now my mother? |
| HERON: | You don't hear that Oliver beat up Gunface? |
| MARLEY: | I heard man, but Gunface is doing wrong man[,] Elaine. |
| HERON: | Yeah man, because he can't take away the man customers . . . . |

MARLEY:     Yeah, you know I am not promoting it but he
            can't do that.

                    . . . .

HERON:      Maurney I can't bother it's custy war.

MARLEY:     Jah knows star.

HERON:      It's custy war is going on Maurney.

MARLEY:     Yeah, that's what I heard is going on around
            there, custy war.  [Voices overlap]

HERON:      It's custy war going on around there.

MARLEY:     How are we not cursing about that mama?

HERON:      Uh?

MARLEY:     How we are not cursing about that?

HERON:      Custy war.  [Laughs]

MARLEY:     And is bad thing selling around there.

HERON:      I am telling you.  Oliver, hey Oliver is
            serious when it come to his customers you
            know.

MARLEY:     Yeah man.

HERON:      [Aside: Yeah man, Oliver still run it.
            [Unintelligible]]

                    . . . .

HERON:      Oliver said I am telling you from now on
            Mama E, you don't know the boy would not
            come out with his [C]utlass you know, I was
            going to kick him down you know.  I said you
            are going to kick down the big man you can't
            do that.

MARLEY:     He is going to try rubbish Boogie-man.

HERON:      Uh?

MARLEY:     He told me from the other day that he has
            his thing on him waiting on Boogie to come
            out with his lass.

HERON:      He told you too.

MARLEY:     If Boogie comes out he is going to get
            rubbish he said.

HERON:      So that means it's a war thing going on
            around there.

18

| MARLEY: | Yeah man, it's Custy war, man. |
| HERON: | Custy war. |
| MARLEY: | Turnback and and what's his name? |
| HERON: | Oliver said he took all of his customers them.  [Voices overlap] |
| | . . . . |
| HERON: | No he can't do that neither, he has to… you know.  Oliver is serious! |
| MARLEY: | Yeah man, he is on it Mama. |

    b.   On or about April 4, 2016, law enforcement agents intercepted a call in which MARLEY and HARLEY apparently discussed, among other things, the need for HARLEY to carry and bring something to a co-conspirator, or "Dog," who reported being followed somewhere by another man.  The conversation that followed included, among other communications, the following exchange:

| HARLEY: | Yeah Hello? |
| MARLEY: | Yo Gunner! |
| HARLEY: | Yeah man. |
| MARLEY: | He is on Elaine's floor and the Dog is saying that he is following him up there. Dog, go up there to go meet the Dog with it. |
| HARLEY: | Dog, I just spoke to him.  He said he is coming. |
| MARLEY: | Yeah the boy Jooks is over there raeing the man, Dog. |
| HARLEY: | Alright, alright, alright cuz.  I am going to go up there.  I am going to go up there. I am going to carry it to give him. |

    20.  Based on my involvement with this investigation and my training and experience, I believe that ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," the defendant, assists JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, by, among other things, possessing and using firearms used by MARLEY and other co-conspirators in furtherance of a narcotics conspiracy, and that HARLEY routinely handles quantities of narcotics.

    21.  I have reviewed information from a law enforcement database, and have learned, among other things, that ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," the defendant, was

issued a New York non-driver's identification card with an associated address of Premises-3.

22.  On or about April 28, 2016, law enforcement authorities searched Premises-3 pursuant to a Search Warrant authorized by Chief United States Magistrate Judge Roann L. Mann of the Eastern District of New York.  Items recovered during the search included, among other things, a Smith & Wesson handgun, and a shoebox containing ammunition, an additional handgun, approximately one pound of marihuana, and papers bearing the name of ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," the defendant.  HARLEY, who was not at Premises-3 at the time of the search, was subsequently arrested at a different location in Brooklyn, New York.

## RADIANNA THOMPSON, a/k/a "Raidy," and Premises-4

23.  Pursuant to the Intercept Orders, law enforcement agents have intercepted communications of JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, with and regarding RADIANNA THOMPOSON, a/k/a "Raidy," the defendant, who resides at a premises in Brooklyn, New York ("Premises-4").  In addition to the communications concerning THOMPSON described above, those interceptions have included, among other communications, the following:

        a.  On or about April 1, 2016, law enforcement agents intercepted a call in which MARLEY and HARLEY apparently discussed, among other things, giving something MARLEY was carrying in his pocket to THOMPSON.  The conversation included, among other communications, the following exchange:

| | |
|---|---|
| HARLEY: | Ummm did you give Raidy the what's it called? |
| MARLEY: | Yeah man.  No, no, no.  I have it in my pocket for real, you know. |
| HARLEY: | Yeah man. |
| MARLEY: | I am going to give her today.  She is going to get it for real. |
| HARLEY: | Alright. |
| | . . . . |
| MARLEY: | I should have given it to her last night when I came and was there but it was a lot of things. |

b.   Late at night on or about April 6, 2016, law enforcement agents intercepted a call in which MARLEY and another individual ("CC-6") discussed a transaction involving THOMPSON.  The conversation included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Yo! |
| CC-6: | Yeah.  You know dudes jumped out with 46 of the thing. |
| MARLEY: | With what? |
| CC-6: | Forty-six of the thing because Elaine did not want to give me the thing. |
| MARLEY: | Give you which thing? |
| CC-6: | Huh? |
| MARLEY: | Which thing? |
| CC-6: | Oh, nothing was at Elaine's for them to leave with?  How much they left with? |
| MARLEY: | It is Raidy. |
| CC-6: | Oh Raidy, yeah.  Raidy gave it to me and my boy brought it.  Are you hearing me? |
| MARLEY: | How much did he bring? |
| CC-6: | My boy brought 36.  And Raidy gave me whatever she was to give me. |
| MARLEY: | Alright. |

c.   At approximately 8:38 a.m. on or about April 7, 2016, law enforcement agents intercepted a call in which MARLEY and THOMPSON apparently discussed a transaction from the previous night in which THOMPSON gave someone "the thing," amid questions about whether CC-5 "owe[s]" something to MARLEY.  The conversation included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Raidy. |
| THOMPSON: | Yeah. |
| MARLEY: | Yeah good morning, who carry that to you? |
| THOMPSON: | [Unintelligible] |
| MARLEY: | Mmm, you give him the thing, right? |
| THOMPSON: | Yeah from last night, yeah. |
| MARLEY: | Mmm. |

21

| THOMPSON: | And he was saying [CC-5] was giving him back chat, talking about he doesn't owe you shit. |
| MARLEY: | He doesn't owe me? |
| THOMPSON: | He doesn't owe you shit. |
| MARLEY: | Alright, I'll call you back.  I'll call [CC-5]. |
| THOMPSON: | Alright, Boo-bee. |

24.   Based on my involvement with this investigation and my training and experience, I believe that RADIANNA THOMPOSON, a/k/a "Raidy," the defendant, assists JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, by, among other things, handling and stashing items used in furtherance of the narcotics conspiracy.

25.   I have reviewed commercial database records regarding the address of the Premises-4, and have learned, among other things, that RADIANNA THOMPSON, a/k/a "Raidy," the defendant, is associated with Premises-4.

26.   On or about April 28, 2016, law enforcement authorities searched Premises-4 pursuant to a Search Warrant authorized by Chief United States Magistrate Judge Roann L. Mann of the Eastern District of New York.  Items recovered during the search included, among other things, a handgun, ammunition, approximately 10 pounds of a substance that appears to be marihuana, and quantities of suspected cocaine and suspected crack cocaine.  RADIANNA THOMPSON, a/k/a "Raidy," the defendant, was present at Premises-4 at the time of the search and was arrested.

## NYKOLI WILLIAMS, a/k/a "Shauney," and Premises-5

27.   Pursuant to the Intercept Orders, law enforcement agents have intercepted communications of JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, with and regarding NYKOLI WILLIAMS, a/k/a "Shauney," the defendant, who resides at a premises in Jamaica, New York ("Premises-5").  In addition to the communications concerning WILLIAMS described above, those interceptions have included, among other communications, the following:

a.   On or about January 6, 2016, law enforcement agents intercepted a call in which MARLEY and WILLIAMS apparently discussed MARLEY's concerns about a co-conspirator ("CC-7") transporting drugs in a rental vehicle—a "Charger" with

New Jersey license plates—that MARLEY and WILIAMS worried was more likely than other types of vehicles to be pulled over by police.  The conversation included, among other communications, the following exchange:

MARLEY:        Yeah listen me now, listen me, right?  [CC-7], now boom, we said we are going to jump go up the road, right?.

WILLIAMS:      Uh hum.

MARLEY:        [CC-7] went like this boom now, he said he wanted the rental.  Remember I told you that he wanted rental boom.  I went and got the rental for him, guess what this youth is doing Mumsie, right?  This man got a big fat Charger Shauney, right, you hear what I tell you?  A big fat Charger, right?

WILLIAMS:      Uh hum.

MARLEY:        With Jersey plate, that makes sense to you?

WILLIAMS:      So why he wants that?

MARLEY:        And he is telling me if he feels comfortable, roo.  Shauney you don't have a seed in it, the only thing up there is some butter for you.  I am not running no risk driving no Jersey plate, while, why you think…?  It's better I put my thing in the Maxima then.  Because you can't have a vehicle going to drive through Syracuse, here, there with a Jersey plate.  Shauney remember more time all some men see a different plate vehicle they want to pull it.  Wrong or right?

WILLIAMS:      Yeah, so why he didn't get a little regular?

MARLEY:        He is saying because it's rush thing, but even if it's rush brother, he is telling me about at the end it is if you feel comf… Dog, I am not going to let you drive no Jersey plate with hundred, January just start.  They don't know where man is coming from or what man is doing, I can't let you do that.  It's like I am sending to give away my thing Shauney if I sit and let you do that, am I lying?  Uh?

                . . . .

23

WILLIAMS:     No, he should have just gotten a basic.

MARLEY:       Yeah, that's what I was telling the dog, he
              went and got Jersey plate.  He is saying he
              drives Jersey plate, I said not a Charger
              like that.  Those Charger there …

WILLIAMS:     Uh hum.

MARLEY:       Those big thick tough Charger there.

WILLIAMS:     And they take off too, so sometimes you
              don't even know how you are maintaining the
              speed.

MARLEY:       Uh?  Yeah!

WILLIAMS:     Sometimes you don't even know how you are
              maintaining.

MARLEY:       Because they are even going 80 and you don't
              know.

WILLIAMS:     Uh hum.

              .  .  .  .

MARLEY:       You can't do that, I can't have a New York
              vehicle and a man is going to say Jah knows,
              that's what Maurney did?  So why he has a
              New York plate vehicle, or oh I have a New
              York plate vehicle and let this man drive a
              what's its name plate, Shauney?  That
              doesn't make any sense.

WILLIAMS:     It doesn't sound logical.

MARLEY:       Yeah, with a dollar!  These time of the
              year!  No, I am not doing that.

              .  .  .  .

WILLIAMS:     Hmm, Maurney you have to stand on your feet,
              you can't let him dictate to you.

      b.    At approximately 8:03 p.m. on or about February
15, 2016—the day before law enforcement agents seized one box
containing approximately 35 pounds of marihuana that had been
transported, along with two other boxes, from Philadelphia, as
described above—WILLIAMS called MARLEY.  The conversation that
followed included, among other communications, the following
exchange:

WILLIAMS:     What time he is going to come in the
              morning?

| | |
|---|---|
| MARLEY: | Who that, Hindu? |
| WILLIAMS: | No the other man. |
| MARLEY: | Which one is that, oh [CC-7]?  He is the one I am trying to program to see what he has now to see if he can jump.  That is what I am here trying to program.  If he can't program I will just have to work with Friday again then.  You see me?  . . . . |
| WILLIAMS: | No because I have somewhere to be at 8 o'clock in the morning. |
| MARLEY: | If he does not, he will probably come tonight man.  If he does not come in the morning you will see him in the evening. |

c.   On or about April 6, 2016, law enforcement agents intercepted a call in which MARLEY apparently directed WILLIAMS to "pick[]up the things and meet" MARLEY because MARLEY had a meeting soon with "one youth."  The conversation included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Where are you? |
| WILLIAMS: | I am home.  Same bullshit again today? |
| MARLEY: | No man I am on the Belt coming.  Here what is going to go on now.  I am going to make you pick[]up the things and meet me because one youth is coming. |
| WILLIAMS: | Mhm. |
| MARLEY: | The youth who I am going to give the cases them, I don't want him to see our place so I just let him meet me same place at 150th there.  You hear? |
| WILLIAMS: | Okay, when? |
| MARLEY: | You had changed out the thing? |
| WILLIAMS: | Uh huh. |
| MARLEY: | Alright the fives.  You did not take the seven out though? |
| WILLIAMS: | No. |
| MARLEY: | When are you going to do it, Shauney?  You are costing me $350 now. |

d.   On or about April 10, 2016, MARLEY and WILLIAMS apparently discussed arrangements for WILLIAMS to deliver "the

thing" to a co-conspirator's mother.  The conversation included, among other communications, the following exchange:

| | |
|---|---|
| MARLEY: | Oh, I forgot to tell you, my boy's mother, um, it's she I'm going to let come pick up the thing you know. |
| WILLIAMS: | Who is she?  My boy's mother what? |
| MARLEY: | The one that came to the party, that dropped me at the house man!  [CC-4]. |
| WILLIAMS: | He's sending his mother come pick up [unintelligible]? |
| | .  .  .  . |
| MARLEY: | He's sending her to the one from you, you know.  The Burger King.  Is it Burger King or McDonald's? |
| WILLIAMS: | You can't send people there Maurney. |
| MARLEY: | Eh?  I didn't let her come on your road.  I let her make the right at that one there, right there Shauney, after your road. |
| WILLIAMS: | No idea.  No way.  She has to go on the outskirts.  I don't care who it is. |
| MARLEY: | Listen now man.  Just drive and go meet the lady around the road for me.  The man's mother is driving from far away.  She's around on that road. |
| WILLIAMS: | This time of night.  Are you serious? |
| MARLEY: | Right there!  She's on the next road!  That's what I'm telling you! |

28.  Based on my involvement with this investigation and my training and experience, I believe that NYKOLI WILLIAMS, a/k/a "Shauney," the defendant, assists JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," the defendant, by, among other things, handling, delivering, and stashing items used in furtherance of the narcotics conspiracy.

29.  I have reviewed records related to utility services provided to Premises-5, and have learned among other things, that the account is associated with NYKOLI WILLIAMS, a/k/a "Shauney," the defendant.

30.  On or about April 28, 2016, law enforcement authorities searched Premises-5 pursuant to a Search Warrant

authorized by Chief United States Magistrate Judge Roann L. Mann of the Eastern District of New York.  Items recovered during the search included, among other things, a handgun.  NYKOLI WILLIAMS, a/k/a "Shauney," the defendant, was present at Premises-5 at the time of the search and was arrested.

WHEREFORE, I respectfully request that an arrest warrant be issued for JASON MARLEY, a/k/a "Maurney," a/k/a "Barber," and ELAINE HERON, a/k/a "Mama," the defendants, and that MARLEY, HERON, DENILLE JAMESON, a/k/a "Danielle," ORLANZO HARLEY, a/k/a "Oliver," a/k/a "Gunner," RADIANNA THOMPSON, a/k/a "Raidy," and NYKOLI WILLIAMS, a/k/a "Shauney," the defendants, be imprisoned or bailed, as the case may be.

_____
JAMES J. ENDERS
Special Agent
Drug Enforcement Administration

Sworn to before me this
28th day of April 2016

_____
THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK